## UNITED STATES DISTRICT COURT
## DISTRICT OF MINNESOTA

| | | |
|---|---|---|
| Mustafa Karama, | ) | Case No. |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | **COMPLAINT** |
| | ) | **(JURY TRIAL REQUESTED)** |
| Worldwide Flight Services, Inc., | ) | |
| | ) | |
| Defendant. | ) | |
| | ) | |

## <u>INTRODUCTION</u>

Plaintiff Mustafa Karama ("Karama") brings this lawsuit to address Worldwide Flight Services, Inc.'s ("WFS" and the "Company") systematic and prolonged discrimination and ultimately unlawful discharge against Karama because of his religion, race, national origin, and color in violation of Title VII of the Civil Rights Act of 1964, as amended, 42 U.S.C.A. §§ 2000e et seq. Further, Plaintiff seeks to recover unpaid wages due to him from his former employer, WFS.

WFS repeatedly failed to accommodate Plaintiff's religious needs, harassed, humiliated, and intimidated Plaintiff with abusive comments and insults because of his Muslim traditions and Somali heritage, and limited his fundamental right to pray and practice his Islamic faith. In addition, Karama was sexually harassed. Indeed, WFS subjected Plaintiff to a prolonged and pervasive hostile work environment throughout his

employment, as part of his unlawful termination of employment, and after his employment ended.

## PARTIES

1.    Plaintiff Mustafa Karama is an individual resident of the City of Bloomington, Minnesota.

2.    Defendant Worldwide Flight Services, Inc. is a Delaware corporation with its registered office address and principal place of business located in Dallas, Texas.

## JURISDICTION AND VENUE

3.    Jurisdiction of this Court is invoked pursuant to 28 U.S.C. §§ 451 and 1331. This action is authorized and instituted pursuant to Sections 706(f)(1) and (3) of Title VII of the Civil Rights Act of 1964, as amended ("Title VII").

4.    Jurisdiction of this Court is also invoked pursuant to 28 U.S.C. § 1332.

5.    Venue herein is proper under 28 U.S.C. § 1391(b), and 42 U.S.C. § 2000e-5(f)(3), as all employment practices alleged to be unlawful were committed within the jurisdiction of the United States District Court for the District of Minnesota.

6.    At all relevant times, Defendant has been a Delaware corporation doing business in the State of Minnesota and employs over 46,000 people worldwide.

7.    At all relevant times, Defendant or its predecessor employed Karama.

## FACTUAL ALLEGATIONS
### WFS' Acquisition of Pinnacle

8. IAS Logistics DFW, LLC d/b/a "Pinnacle Logistics" ("Pinnacle") was one of the leading providers of cargo handling services in the United States.

9. Pinnacle hired Karama as a warehouse agent and forklift driver in February 2021.

10. In September 2021, WFS acquired Pinnacle, and Karama's employment contract was assigned to WFS.

11. WFS is a global company in the business of processing and transporting goods—both by air and by ground transportation. WFS boasts over 46,000 employees across its company.

12. In September 2022, SATS Ltd. acquired WFS.

## Mustafa Karama's General Employment Conditions

13. Karama is a Muslim man who was born in Somalia and immigrated to the United States from Yemen.

14. When Pinnacle hired Karama in August 2020 as a warehouse agent, Karama's initial hourly pay rate was $15.00 per hour.

15. In December 2020, Karama received a pay increase to $18.50.

16. Karama's duties as a warehouse agent were to package boxes and to load and unload cans (metal boxes that are placed in trucks).

17. On April 7, 2022, Karama's position changed from warehouse agent to ramp agent.

18.    Karama's duties as a ramp agent were to perform ramp service tasks, including loading and unloading baggage and cargo, and marshalling aircraft.

19.    WFS promoted Karama to a supervisor position, earning $20.50 per hour.

20.    When tensions began to escalate among the Muslim employees and management, Karama stepped down from his supervisory role because he feared for his safety. His pay rate changed to $18.50 per hour.

21.    On April 27, 2022, when WFS terminated Karama, he was earning $18.50 per hour.

**Plaintiff's Practice of the Muslim Faith is an Essential Part of His Character.**

22.    Karama, suffered discrimination on the basis of his religion, race, national origin, and color by WFS' managers and managerial employees.

23.    It is part of Karama's Muslim faith to pray five times per day at a precise time based on the motions of the sun and the moon: one prayer takes place in the morning -the Fajr prayer; another close to noon -the Dhuhr prayer; one in the afternoon -the Asr prayer; another at sunset -the Maghrib prayer; and finally, one in the evening -the Isha prayer.

24.    For Karama, praying on time is very important because it is part of his belief that missing a prayer is a sin against God.

25.    Karama believes that, absent willful neglect, divine mercy is possible, but it is up to God's mercy to determine whether to accept late prayers and what mercy to extend for missed prayers.

26.     For Karama, Wudu is a core belief and practice of Islam.

27.    In the Islamic faith, Wudu is the procedure of cleansing and purifying hands, mouth, nose, face, hair, ears, ankles, and feet before beginning the required prayers and presenting oneself to God.

28.    Ramadan is the Muslim holy month, where Karama and other Muslims focus on spiritual growth, praying, community, and reflection.

29.    Throughout Ramadan, Muslims fast from just before sunrise, or Fajr prayer, to the sunset prayer, Maghrib.

30.    The end of Ramadan marks the beginning of one of the major holidays in the Muslim faith: Eid.

31.    In Arabic, Eid means "Festival of breaking the fast" and is a holiday on which Muslims traditionally do not work because they gather with family and friends to celebrate this holiday.

32.    For Karama, Eid is the most important holiday in his faith and a time when he gathers with family and community.

### WFS' Ongoing and Systematic Discrimination Against Karama and Other Muslims In The Workplace

33.    In observance of his faith, Karama prayed at work.

34.    WFS's management continually harassed him during his prayers.

35.    Several WFS managers, including but not limited to Senior Manager on Duty April Joiner ("Joiner"), General Manager Jason Watson ("Watson"), Operations Manager Jeremy Van Bogart ("Van Bogart"), Supervisor David Hernandez ("Hernandez"), Manager on Duty Kalla Awatt ("Awatt"), Executive Vice-President Mike

Simpson ("Simpson"), Jennifer West ("West") (believed to be in Human Resources), and temporary General Manager Ben Tauataire ("Tauataire") (who normally worked in California), were hostile toward Karama and other Muslim employees.

36.    Supervisor Hernandez frequently lamented to other Muslim employees statements such as, "fuck, I hate this bullshit with his praying."

37.    Supervisor Hernandez would follow Muslim employees around when they were praying and said, "fuck you, go home. You're not listening to me."

38.    Karama heard Senior Manager on Duty Joiner lament that (Defendant) "could not control 'those people'" referring to Muslim employees.

39.    Joiner told Karama that he was considered a supervisor only for the Muslim employees. Karama rejected that insinuation and told Joiner that he acted as a supervisor for all employees, not just the Muslim employees.

40.    On several occasions, Supervisor Hernandez call a group of Muslims "ten fucking people," or heard him saying, "they fucking pray too much."

41.    On some occasions, Hernandez stopped Muslim workers on their way to pray telling them there was work to be done, even though the prayer would not be disruptive to his work and would not take more than ten minutes.

42.    Another WFS' supervisor, Ali Abdakadr ("Abdakadr"), who referred to himself as General Manager, would hover and spy on Karama and other Muslims in his prayer area to see if they were really praying. His presence was intimidating and disruptive to Karama and the employees trying to pray.

43.    In March 2022, before Ramadan, Karama and a co-worker met with Vice President Simpson and a general manager to discuss Muslims needs during Ramadan.

44.    Karama and the other co-worker explained that he and other Muslim employees would be fasting during the month of Ramadan, with Eid immediately following.

45.    Karama also asked permission for the Muslim workers to have the day off for Eid.

46.    Simpson told Karama that WFS could accommodate the request for Muslim employees to take the day off for Eid because there would be enough staff to cover their shifts.

47.    Simpson told Karama and the other co-worker to make a written request and Karama complied.

48.    Karama requested the day of Eid off of work, providing sufficient prior written notice.

49.    Just before the Eid holiday, WFS reversed its decision.

50.    WFS never suggested a religious accommodation, despite the multiple requests from its Muslim employees, including Karama.

51.    Taking Eid off would have not caused undue hardship to the conduct of WFS' business, a company with over 100 warehouse employees.

### Karama and Other Muslim Employees Reported the Abusive Conduct, but the Situation Worsened

52. On December 13, 2021, Hernandez yelled from across the warehouse, "this is fucking bullshit," in reference to Muslims praying that day.

53. On the same day, the General Manager Watson said he wanted to "stop hiring Muslims because they pray too much."

54. Additionally, Manager on Duty Joiner stated that she was, "tired of those stupid (Muslim) women going to the bathroom all the time. I hate those women," referring to the Muslim's use of the bathroom from religious washing rituals.

55. As a Muslim, Karama felt very offended and outraged by his supervisors' insults to his religious practices.

56. Soon after, Hernandez went to speak to General Manager Watson and Operations Manager Van Bogart. The three of them started to mock the Muslim employees in plain sight, pointing at them and laughing.

57. Karama felt targeted and attacked by Hernandez's vulgar declaration and the management's mocking of the Muslim employees.

58. On December 13, 2021, a very upset young Somali woman reported to Karama that a supervisor had cursed her and other Muslim women out.

59. Karama heard the supervisor yelling curse words.

60. After a co-worker reported the incident to Operations Manager Van Bogart, rather than addressing the conflict, Van Bogart, Watson, and Hernandez began laughing at and mocking the Muslim employees.

### Karama, and other Muslim employees Experienced Pervasive Sexual Harassment by Senior Manager Joiner

61.     Throughout his employment at WFS, Karama endured a pattern of sexual harassment by his direct supervisor, Senior Manager Joiner.

62.     Joiner engaged in repeated and unwelcome conduct of a sexual nature, including suggestive remarks, nonconsensual physical contact, and public humiliation.

63.     Joiner repeatedly called Karama "Baby," "Baby daddy," and "sweety."

64.     Without Karama's consent, Joiner would inappropriately touch his head and hair and say his hair was so soft, often in front of other employees.

65.     These unwelcome and unwanted advances caused Karama to feel uncomfortable, embarrassed and humiliated.

66.     Karama told Joiner many times that he was a married man and that those comments were offensive to him, but she did not stop.

67.     Karama reported Joiner's sexual harassment to the general manager and operations manager, but WFS failed to address Karama concerns.

68.     Despite Karama's repeated reports up the chain of comment, the verbal and physical sexual harassment continued.

69.     Karama also heard Joiner asking Muslim and Somali women if they had their genitals mutilated.

70.     Karama also heard Joiner asking Muslim and Somali women if they were virgins.

### The December 13, 2021 Protest and Subsequent Retaliation

71.     After the systematic and prolonged discrimination and harassment in the WFS workplace, and supervisors' vulgar verbal assaults and the mocking response from WFS's management, on December 13, 2021, several Muslim employees, including Karama, walked out and protested in front of the WFS warehouse (the "December 13 protest").

72.     At the December 13 Protest, the Muslim employees demanded an end to religious, sex and racial discrimination at WFS and accountability for the discrimination they suffered.

73.     Management spoke to the protestors and guaranteed Karama that he could come back to work and that there would be no negative consequences to him.

74.     WFS's management assured Karama and his coworkers that it would investigate the religious discrimination and that the situation would improve.

75.     However, after his return, management retaliated, sabotaged him, made him perform work that was outside his job duties and wrote him up for no apparent reason.

### WFS Retaliated Against Karama and Other Muslim Employees Who Had Participated in the December 13 Protest in Multiple Ways

76.     Following the December 13, 2021 protest, WFS required Karama to perform duties outside his regular job duties, wrote him up without adequate reason, and took away his overtime hours, even while the Company continued to allow non-Muslim employees to continue to work overtime.

77.    WFS's management required Karama, and other Muslim employees to perform the made-up task of Foreign Object Debris ("FOD") walks in the parking lot of the warehouse.

78.    FOD walks were typically assigned to WFS employees who worked at the airport.  During airport FOD walks, workers patrolled airport runways for FOD.

79.    Karama did not work at the airport, but at a warehouse site as a warehouse agent.

80.    There was no need for FOD walks at the warehouse site.

81.    Warehouse agents were to perform inventory-related work within the warehouse, not outside of it.  WFS made up FOD walks at the warehouse as a new task for the December 13 Protest protesters.

82.    Although it had never been the responsibility of Karama to perform FOD walks before the December 13 Protest, WFS fabricated this version of FOD walks for Karama and the Muslim employees to perform.

83.    Karama and the other Muslims had never been asked to clean the parking lot prior to the December 13 Protest.

84.    On many occasions, Karama and the other Muslims who participated in the December 13 Protest were asked to perform other work outside his job duties, including cleaning the outdoor parking lot of the warehouse—clearly not responsibilities related to inventory management or processing—or even related to the intent of FOD walks to make runways safe.

85.    Karama, and several other Muslim employees who participated in the December 13 Protest and then refused to perform FOD walks were subsequently written up.

86.    Karama was asked to perform FOD walks and was written up three times for not doing so.

87.    WFS did not sanction employees who had not participated in the December 13 Protest for failing to perform FOD walks at the warehouse site.

88.    WFS retaliated against Muslim employees who participated in the December 13 Protest by requiring them to perform janitorial duties such as taking out garbage and cleaning bathrooms.

89.    Muslims employees who participated in the December 13 Protest who then refused to perform janitorial duties were written up.

90.    Karama, and the other Muslim employees who participated in the December 13 protest were not allowed to request to work overtime, as they had been able to prior to the protest.

91.    Karama requested his personnel file records twice, one on December 29, 2021 and another one month after.

92.    WFS never responded to Karama's request for personnel records.

**Karama's Subsequent Termination of his Employment**

93.     On or about April 19, 2022, Karama had an encounter with Supervisor Abdulkadir after Abdulkadir mocked and disrespected the Muslims because they were fasting.

94.     Kamara told Abdulkadir to stop picking on Muslim employees, but in response, Kamara was written up for insubordination.

95.     In reality, Karama was written up because he reported Abdulkadir's abusive conduct towards Muslims.

96.     On April 21, 2022, Manager on Duty Awatt instructed Karama to participate in another FOD walk, and Karama refused.

97.     Karama was written up for refusing to participate in the FOD walk.

98.     On April 27, 2022, Karama was told he was being terminated for insubordination for refusing to participate in FOD walks.

99.     In reality, Karama was terminated for engaging in protected conduct.

100.    After termination, WFS failed to pay part of his wages.

101.    To date, WFS has still not paid the full amount due for his wages.

102.    Additionally, WFS failed to pay hours of accrued vacation time and accrued sick time to Karama.

103.     To date, WFS has still not paid the full amount due.

104.    Karama suffered reprisal and was terminated for raising issues of discrimination and abusive practices.

105.    Further, to intentionally prevent Karama from collecting oployment benefits to which he should have been entitled, WFS misrepresented his termination to the Minnesota Department of Employment and Economic Development ("DEED").

106.    As a result of WFS's conduct, Karama suffered emotional and economic distress and was unable to pay rent or his bills.

### Exhaustion of Administrative Remedies

107.    Karama cross-filed a Charge of Discrimination with the Minnesota Department for Human Rights ("MDHR") and the United State Equal Employment Opportunity Commission ("EEOC") regarding the above discriminatory-based conduct.

108.    The EEOC investigated Plaintiff's allegations.

109.    On July 30, 2025, the EEOC issued its determination on the merits and found that "evidence obtained in the investigation establishes reasonable cause to believe Respondent discriminated against the Charging Party based on his religion, Muslim; national origin, Somali; and in retaliation for participating in protected activity when it harassed, disciplined, and terminated him from employment, in violation of Title VII" ("Determination Notice").

110.    On August 13, 2025, the EEOC issued the Notice of Plaintiff's Right to Sue.

111.    Karama timely invoked and fully exhausted all administrative remedies applicable to this action.

### CAUSES OF ACTION

## COUNT I- DISCRIMINATION BASED ON RELIGION, RACE, NATIONAL ORIGIN, AND COLOR IN VIOLATION OF TITLE VII OF THE CIVIL RIGHT ACT OF 1964 (42 U.S.C. § 2000e)

112.    Karama re-alleges the allegations set forth in all of the above paragraphs as if fully set forth herein.

113.    Since around April 2021, Defendant has engaged in unlawful employment practice at WFS in violation of Title VII of The Civil Rights Act of 1964 (42 U.S.C. § 2000e-2(a)) by denying equal employment opportunities to Muslim employees because of their sincere religious belief regarding the number of prayers during a day, their request to take Eid off in observance of his religion, the practice of Wudu, and by its management's demeaning comments about their prayers, cleanliness, and dining traditions.

114.    Non-Muslim, non-immigrant employees were not subject to limitations on their faith, nor were they subject to similar pejorative comments about his traditions or religion.

115.    Defendant terminated Plaintiff's employment because of his sincere religious practices of praying during the workday, and his involvement in protected conduct.

116.    Defendant's practices deprived Plaintiff and other Muslim employees of equal employment opportunities and otherwise adversely affect their employment status because of their religious beliefs.

117.    The unlawful employment practices herein described were and are intentional.

118.    The unlawful employment practices herein described were done with malice or with reckless indifference to the federally protected rights of Plaintiff and other aggrieved Muslim employees.

119.    The EEOC found that evidence obtained in its investigation establishes reasonable cause to believe that WFS discriminated against Plaintiff based on his religion, national origin, and in retaliation for participating in protected activity when it harassed, disciplined, and terminated his from employment, in violation of Title VII.

120.    As a direct and proximate result of the acts and omissions of WFS, Plaintiff was forced to endure suffering, mental anguish, inconvenience, and loss of enjoyment of life, and thereby entitled to compensatory past and future pecuniary and non-pecuniary losses in an amount yet to be determined, but in an amount in excess of $75,000.

121.    As a direct and proximate result of the acts of omissions of WFS, Plaintiff lost wages and benefits and is entitled to back pay.

122.    This Court should award such injunctive relief as appropriate, including but not limited to appropriate front pay and action to stop any discriminatory practices still being taken by WFS.

123.    Punitive damages are available against WFS for its malice and reckless indifference for Plaintiff's rights and its intentional violations of the federal law and are hereby claimed as a matter of federal law, *Smith v. Wade*, 461 U.S. 30 (1983), and, as such, are not subject to the pleading requirements set forth in Minn. Stat. § 549.20.

124.    Plaintiff is entitled to recover his reasonable attorneys' fees, expert-witness fees, and court costs.

## COUNT II- RELIGIOUS ACCOMMODATION
## FAILURE TO ACCOMMODATE – (42 U.S.C. § 2000e-2(a))

125.    Plaintiff re-alleges the allegations set forth in all of the above paragraphs as if fully set forth herein.

126.    Defendant has engaged in unlawful employment practices in violation of Section 703(a) of Title VII, 42 U.S.C. § 2000e-2(a) by failing to reasonably accommodate the religious beliefs and/or practices of Muslim employees.

127.    Title VII requires WFS to accommodate its employees' sincerely held religious beliefs reasonably. Defendant refused to provide religious accommodation to allow Plaintiff to pray at work without facing abusive comments and offensive mockery, and to feel free to exercise his religion without having someone supervising and harassing his while praying.

128.    Defendant did not give any alternative that would reasonably accommodate Plaintiff's religious needs.

129.    Rather, Defendant allowed Plaintiff's supervisors and others with managerial positions to harass, offend, mock, and limit Plaintiff's practice of his sincerely held religious beliefs.

130.    WFS refused to provide religious accommodation when it created new hurdles to make it difficult to take the day off for Eid.

131.    WFS also sanctioned, retaliated, and set up a hostile work environment for Plaintiff because she followed his religious beliefs.

132.    WFS had the affirmative duty to reasonably accommodate the religious observances and practices of its employees because the religious accommodation that Karama, and other Muslim employees were requesting would not cause undue hardship to the conduct of its business.

133.    The unlawful employment practices herein described were and are intentional.

134.    The unlawful employment practices herein described were done with malice or with reckless indifference to the federally protected rights of Plaintiff and other aggrieved Muslim employees.

135.    As a direct and proximate result of the acts and omissions of WFS, Plaintiff was forced to endure suffering, mental anguish, inconvenience and loss of enjoyment of life, and thereby entitled to compensatory past and future pecuniary and non-pecuniary losses in an amount yet to be determined, but in an amount in excess of $75,000.

136.    As a direct and proximate result of the acts of omissions of WFS, Plaintiff lost wages and benefits and is entitled to back pay.

137.    This Court should award such injunctive relief as appropriate, including but not limited to appropriate front pay and action to stop any discriminatory practices still being taken by WFS.

138.    The EEOC found that evidence obtained in its investigation establishes reasonable cause to believe that WFS discriminated against Plaintiff based on his religion, national origin, and in retaliation for participating in protected activity when it harassed, disciplined, and terminated his from employment, in violation of Title VII.

139.    Punitive damages are available against WFS for its malice and reckless indifference for Plaintiff's rights and its intentional violations of the federal law and are hereby claimed as a matter of federal law, *Smith v. Wade*, 461 U.S. 30 (1983), and, as such, are not subject to the pleading requirements set forth in Minn. Stat. § 549.20.

140.    Plaintiff is entitled to recover his reasonable attorneys' fees, expert-witness fees, and court costs.

## COUNT III-RETALIATION IN VIOLATION OF TITLE VII
### (42 U.S.C. § 2000e-3)

141.    Plaintiff re-alleges the allegations set forth in all of the above paragraphs as if fully set forth herein.

142.    Defendant has engaged in unlawful employment practices at the WFS' warehouse location in Minneapolis, Minnesota, in violation of Section 704 of Title VII, 42 U.S.C. § 2000e-3 by retaliating against Muslim employees who reported the ongoing discrimination and/or complained about religious discrimination, who engaged in the December 13 protest and who participated in the May 10 Walkout.

143.    In particular, WFS made up new job tasks for the protesters, fabricated a version of FOD walks for the Muslim employees to perform, wrote up Plaintiff and other Muslim employees for not performing FOD walks even though they were not part of their job, reduced Plaintiff's overtime hours, and denied Karama's and other Muslim employees' promotions.

144.    After Plaintiff and other Muslim employees requested religious accommodation and/or complained about sex, national origin, and religious

discrimination, they were subjected to actions outside their job duties, increasing

harassment and hostile work environment up until the termination of employment.

145.    The unlawful employment practices herein described were and are

intentional.

146.    The unlawful employment practices herein described were done with

malice or with reckless indifference to the federally protected rights of Plaintiff and other

aggrieved Muslim employees.

147.    As a direct and proximate result of the acts and omissions of WFS, Plaintiff

were forced to endure suffering, mental anguish, inconvenience and loss of enjoyment of

life, and thereby entitled to compensatory past and future pecuniary and non-pecuniary

losses in an amount yet to be determined, but in an amount in excess of $75,000.

148.    As a direct and proximate result of the acts of omissions of WFS, Plaintiff

lost wages and benefits and is entitled to back pay.

149.    This Court should award such injunctive relief as appropriate, including but

not limited to appropriate front pay and action to stop any discriminatory practices still

being taken by WFS.

150.    Punitive damages are available against WFS for its malice and reckless

indifference for Plaintiff's rights and its intentional violations of the federal law and are

hereby claimed as a matter of federal law, *Smith v. Wade*, 461 U.S. 30 (1983), and, as

such, are not subject to the pleading requirements set forth in Minn. Stat. § 549.20.

151.    The EEOC found that evidence obtained in its investigation establishes

reasonable cause to believe that WFS discriminated against Plaintiff based on his

religion, national origin, and in retaliation for participating in protected activity when it harassed, disciplined, and terminated him from employment, in violation of Title VII.

152.   Plaintiff is entitled to recover his reasonable attorneys' fees, expert-witness fees, and court costs.

## COUNT IV- RELIGIOUS DISCRIMINATION AND ACCOMMODATION IN VIOLATION OF THE MINNESOTA HUMAN RIGHTS ACT

153.   Plaintiff re-alleges the allegations set forth in all of the above paragraphs as if fully set forth herein.

154.   Under the Minnesota Human Rights Act ("MHRA"), employers are prohibited from discharging an employee or discriminating against an employee based on race, sex, color, creed, religion, and national origin.

155.   WFS intentionally discriminated against Karama and other Muslim employees based on their religion, race, color, and national origin, when it engaged in unfair employment practices such as disparate treatment, failure to accommodate religious beliefs and practices, and ultimately his unlawful termination.

156.   Defendant intentionally discriminated against Plaintiff when it fabricated a version of FOD walks only for Plaintiff and other Muslim employees, but not for all employees, when it required Plaintiff and other Muslim employees to perform janitorial duties, but not other employees, when it wrote up Plaintiff for not performing FOD walks, but not other non-Muslim employees who also refused.

157.    Plaintiff was subjected to a hostile work environment when WFS managers used offensive language, attitudes and actions of repulsion and antipathy against Plaintiff and other Muslim employees.

158.    Non-Muslim, non-immigrant employees were not subject to limitations on their faith, nor were they subject to similar pejorative comments about their traditions or religion.

159.    Plaintiff was retaliated against when Defendant terminated his employment for being involved in protected conduct.

160.    The unlawful employment practices herein described were done with malice or with reckless indifference to the protected rights of Plaintiff and other aggrieved Muslim employees.

161.    As a proximate result of Defendant's acts of unlawful discrimination, Plaintiff suffered actual damages such loss of back pay and front pay, mental anguish and suffering, and is entitled to compensatory damage, in an amount up to three times the actual damages sustained.

162.    This Court should award such injunctive relief as appropriate, including but not limited to appropriate front pay and action to stop any discriminatory practices still being taken by WFS.

163.    Plaintiff will move this Court in accordance with Minn. Stat. § 549.20 to apply to claims for punitive damages, as determined by a jury, under the MHRA.

164.    Plaintiff is entitled to recover his reasonable attorneys' fees, expert-witness fees, and court costs.

## COUNT V- SEXUAL HARASSMENT IN VIOLATION OF
## TITLE VII (42 U.S.C. § 2000e-3)

165.    Plaintiff re-alleges the allegations set forth in all of the above paragraphs as if fully set forth herein.

166.    Defendant is an "employer" within the meaning of Title VII, 42 U.S.C. § 2000e(b), and is subject to its provisions.

167.    Plaintiff is an "employee" within the meaning of Title VII, 42 U.S.C. § 2000e(f), and is protected under the statute.

168.    During the course of Plaintiff's employment, Plaintiff was subjected to unwelcome sexual conduct by Defendant and/or Defendant's agents, including but not limited to unwanted touching and repeated advances by a supervisor.

169.    The conduct was severe or pervasive enough to alter the conditions of Plaintiff's employment and create an abusive working environment.

170.    Defendant knew or should have known about the harassment and failed to take prompt and appropriate remedial action.

171.    As a direct and proximate result of Defendant's unlawful conduct, Plaintiff has suffered damages including emotional distress, humiliation, loss of income, and other economic and non-economic harm.

## COUNT VI- FAILURE TO PAY WAGES IN VIOLATION OF
## MINN.STAT. §§ 181, et seq. (the "Minnesota Payment of Wage Act")

172.    Plaintiff re-alleges the allegations set forth in all of the above paragraphs as if fully set forth herein.

173.    At the time of termination, WFS owed several hours of accrued and unpaid vacation and sick time to Karama.

174.    Additionally, at the time of termination, WFS owed wages to Karama for work that he performed before he was terminated.

175.    Karama made a demand for payment of wages owed.

176.    WFS had the duty to make payment of actual wages owed upon termination of the employment contract.

177.    WFS' failure to pay Karama for wages owed constitutes a violation of the Minnesota Payment of Wages Act, Minnesota Statutes § 181 et. Seq.

178.    Due to WFS's non-payment of owed wages within the time outlined under the Minnesota Payment of Wages Act, WFS is liable to Karama for a penalty equal to the amount of Karama's average daily earnings for every day until WFS pays Karama's and Karama's owed wages, up to a maximum of 15 days of his wages.

179.    As a result of WFS's conduct and violations of the Minnesota Payment of Wages Act, Karama is entitled to damages in an amount to be determined at trial, plus reasonable costs and attorney fees, and pre-judgment interest.

180.    Karama is entitled to the payment of lost wages, front pay, and Minn. Stat §181.13 Penalty for failure to pay wages.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff Mustafa Karama requests the following relief:

1.      Judgment against WFS and award of damages, including statutory penalty damages, in an amount to be determined at trial;

2.      Order Defendant to pay punitive damages for its unlawful employment practices done with malicious or reckless disregard for the protected state and federal rights of Mustafa Karama and other aggrieved Muslims, in amounts to be determined at trial;

3.      Order Defendant to provide compensation for past and future compensatory losses resulting from the unlawful employment practices, including emotional pain, suffering, inconvenience, mental anguish, loss of enjoyment of life and humiliation, in amounts to be determined at trial;

4.      Order Defendant to pay for lost wages and benefits including appropriate back pay and front pay;

5.      Order Defendant to pay treble damages where allowed;

6.      An award of Karama's reasonable costs, including expert-witness fees, and attorneys' fees incurred in connection with this action;

7.      Issue an injunction providing for front and back pay, and to stop WFS's discriminatory practices; and

5.      Such other and further relief at law or in equity as the Court may deem just and proper.

                                **SAPIENTIA LAW GROUP, PLLC**


Dated:  November 10, 2025              s/Sonia Miller-Van Oort
                                       Sonia Miller-Van Oort (#278087)

Jonathan A. Strauss (#0279602)
Andrea C. Mejia (#0400909)
120 South Sixth Street, Suite 100
Minneapolis, MN 55402
612-756-7100
soniamv@sapientialaw.com
jons@sapientialaw.com
andream@sapientialaw.com

4936-8026-5592, v. 2